*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MICHAEL JAMES SCANDALITO,

Defendant-Appellant.

UNPUBLISHED
December 22, 2022

No. 359491
St. Clair Circuit Court
LC No. 21-000079-FC

Before: M. J. KELLY, P.J., and MURRAY and RIORDAN, JJ.

PER CURIAM.

Defendant, Michael Scandalito, pleaded guilty to first-degree home invasion, MCL 750.110a(2), assault with intent to rob while armed, MCL 750.89, assault with a dangerous weapon, MCL 750.82, and two counts of resisting or obstructing a police officer, MCL 750.81d(1). The trial court sentenced him as third-offense habitual offender, MCL 769.11, to serve 15 to 40 years' imprisonment for the first-degree home invasion conviction, 15 to 40 years' imprisonment for the assault with intent to rob while armed conviction, two to eight years' imprisonment for the assault with a dangerous weapon conviction, and one to four years' imprisonment for the resisting or obstructing a police officer convictions. We affirm for the reasons stated in this opinion.

## I. BASIC FACTS

Scandalito pleaded guilty to the above charges. As the basis for his plea, he testified that in October 2020, he entered his grandmother's home without permission and demanded that she give him the keys to her vehicle so that he could take it. When she refused, he held a pair of scissors to her neck and demanded the keys. Two other people were in the home at the time: Scandalito's great uncle, who ran from the home and called the police, and Scandalito's cousin, who tackled Scandalito and fought him. Scandalito had a knife or a box-cutter in his hand during the fight with his cousin, and, although he was not cut, Scandalito's cousin lost some teeth during the altercation. When the police arrived, they attempted to separate Scandalito and his cousin. Scandalito was forcibly restrained by the police; Scandalito testified that he resisted and obstructed the officers' ability to do their jobs.

In exchange for Scandalito's guilty pleas, the prosecution agreed to (1) send a memorandum to the probation department of the Michigan Department of Corrections (MDOC) with the parties' calculated sentencing guidelines range, which reflected a range of 126 to 315 months' imprisonment; (2) not seek consecutive sentencing; and (3) reduce Scandalito from a fourth-offense habitual offender to a third-offense habitual offender. Before accepting Scandalito's pleas, the trial court inquired whether Scandalito understood that the trial court was not bound by the parties' calculated guidelines range and that it had the ultimate authority to score the guidelines and sentence Scandalito accordingly. Scandalito stated he understood. He also affirmed his understanding that he would not be able to withdraw his plea if the court did not adhere to the guidelines range calculated by the parties.

After accepting Scandalito's plea, the trial court referred the matter to the probation department to create a presentence investigation report (PSIR). The probation department received the prosecution's memorandum concerning the parties' calculated guidelines range. However, it calculated that the sentencing guidelines range was 171 to 427 months, not 126 to 315 months. The difference in the guidelines range was because the probation department discovered that Scandalito had four additional felony convictions that had not been accounted for when the parties calculated the guidelines. In a sentencing memorandum, Scandalito noted that there was no sentencing agreement, but argued that the court should apply the guidelines range that had been calculated in good faith by the parties. In response, the prosecution asserted that it had adhered to the sentencing agreement by providing the probation department with a memorandum indicating the parties' calculated guidelines range and detailing the other agreements. The prosecution objected to Scandalito's request that the court apply the parties' calculated guidelines range, noting that the court had warned Scandalito before he pleaded guilty that it was not bound by the parties' calculation of the guidelines.

At the sentencing hearing, the trial court determined it would make some changes to the assessed variables in the guidelines calculated by the MDOC, but noted the MDOC was "in the second best position to have an understanding as to what the prior record variables should look like." The trial court scored Scandalito's guidelines sentence range at 135 to 337 months' imprisonment and sentenced him accordingly. Thereafter, Scandalito moved to correct his sentence, for specific performance, and for resentencing, arguing his guilty pleas "were induced in part by the prosecution's commitment 'to memo the probation department the guidelines scoring, which is 126 months to 315 months.' " He alleged that the prosecution violated this agreement "when it specifically disclaimed that the agreed upon score was the correct [score] in its memo to the MDOC and its argument to the Court." Scandalito noted: "The 70-point [prior record variable (PRV)] Score included the caveat: 'Dependent upon plea; assuming no other convictions.' " Scandalito contended: "The purpose served by the prosecutor's agreement 'to memo the probation department the [126 to 315-month] guidelines scoring,' was that the Prosecutor's Office would stand behind that score, defend its accuracy, and urge the MDOC, and by extension, the Court, to adopt that guideline range[.]" He argued that he was entitled to have the prosecution "specifically perform its obligation under the plea agreement by not just providing the MDOC a document listing the 126- to 315-month guideline range it agreed to, but by advancing that as the correct guideline range" that should be used by the MDOC and the trial court.

Further, Scandalito argued he was also entitled to resentencing because the guidelines were incorrectly scored. PRV 2 should have been assessed at 20 points because the attempted felonious assault conviction considered by the MDOC was a misdemeanor, not a felony, under the Michigan Penal Code, MCL 750.1 *et seq.*, and offense variable (OV) 9 was improperly assessed at 10 points because only his grandmother was in immediate danger of physical injury or loss of life during the sentencing offense. Scandalito argued that correction of the improperly assessed variables required resentencing because it reduced his guidelines range to 108 to 270 months' imprisonment.

In response, the prosecution asserted that the agreement between the parties was fulfilled. That agreement was not a "sentencing agreement" because it did not mandate that the trial court adhere to the parties' calculated guidelines range. Consequently, Scandalito was not entitled to a specific sentence in exchange for his pleas. The prosecution also contended that PRV 2 and OV 9 were properly scored.

At the hearing on Scandalito's motion, the trial court stated that Scandalito's argument for specific performance was misplaced, because the parties could not bind the trial court to a specific guidelines score. The trial court determined there was "no type of agreement[,]" because Scandalito knew when he entered his pleas the calculated range was a good-faith effort, and the prosecution never affirmatively changed its position by arguing for a higher sentence. It was common for the prosecution to engage in good-faith negotiations with defendants, which would be placed on the record when the plea is made, and then put into a memorandum and sent to the MDOC for consideration when drafting the PSIR. This is exactly what happened in this case. The trial court concluded the prosecution "held up its end of the bargain[,]" and made no promises for specific performance.

Moreover, the trial court was not persuaded by Scandalito's argument regarding PRV 2, noting Scandalito pleaded guilty to attempted felonious assault as a second-offense habitual offender, which was a class "H" felony, MCL 777.52(2)(a); MCL 777.19; MCL 777.16d. Nor was the trial court persuaded by Scandalito's argument regarding OV 9, because, when considering the number of victims under OV 9, the entire transaction is considered. The court reasoned that the fight with his cousin occurred very shortly after his assault of his grandmother, and the two assaults were part of the same transaction or occurrence.

## II. SENTENCING

### A. STANDARD OF REVIEW

Scandalito argues the trial court erred by refusing to order specific performance from the prosecution regarding the plea agreement. He also argues that the court erred by refusing to resentence him despite the fact that PRV 2 and OV 9 were improperly scored. A plea agreement "must be reviewed in the context of its function to serve the administration of justice." *People v Swirles*, 218 Mich App 133, 135; 553 NW2d 357 (1996). "Contractual analogies may be applied in the context of a plea agreement . . . ." *Id.* Factual issues are reviewed for clear error. *Id.* at 136. "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *Id.* Questions of law are reviewed de novo. *People v Steele*, 283 Mich App 472, 486; 769 NW2d 256 (2009). "This Court reviews a trial court's scoring decision under the sentencing guidelines to determine whether the

trial court properly exercised its discretion and whether the record evidence adequately supports a particular score." *People v Crews*, 299 Mich App 381, 387; 829 NW2d 898 (2013) (quotation marks and citation omitted).

## B. ANALYSIS

### 1. SPECIFIC PERFORMANCE

A "defendant may withdraw his plea when a sentence agreement or recommendation will not be satisfied in order to protect the defendant's right to make a knowing and intelligent waiver of his right to trial and its companion rights." *People v Siebert*, 450 Mich 500, 510; 537 NW2d 891 (1995) (quotation marks and citation omitted). "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Id*. at 517 (quotation marks, citation, and emphasis omitted).

Although there is no formal written plea agreement in this case, the parties put the terms of the plea agreement on the record in open court. The agreement required: (1) the prosecution agreeing to send a memorandum to the probation department containing the parties' good-faith guidelines range calculations; (2) Scandalito being reduced from a fourth-offense habitual offender to a third-offense habitual offender; and (3) the prosecution agreeing not to seek consecutive sentencing. The prosecution fulfilled its obligations under the plea agreement: it lowered Scandalito from a fourth-offense habitual offender to a third-offense habitual offender, sent a memorandum to the probation department with the parties' calculated guidelines range, and did not recommend consecutive sentencing. As such, there is nothing for the prosecution to specifically perform.

Contrary to Scandalito's argument on appeal, nothing in the record exists suggesting the plea agreement was a "sentencing agreement," such that the prosecution and the trial court, in accepting the pleas, were required to adhere to the pleas' terms or permit Scandalito to withdraw his pleas. Nor is there any indication that, in addition to sending the memorandum to the probation department, the prosecution agreed to argue that the guidelines as calculated by the parties were accurate notwithstanding additional information that showed that they did not account for Scandalito's entire criminal history. Thus, the prosecution did not breach its agreement when it deferred to the probation department's scoring of the sentencing guidelines, which included additional criminal convictions. Indeed, the PRV score calculated by the parties contained a caveat that it assumed there were no other convictions. Interpreting the plea agreement as requiring the prosecution to stand behind the calculations, regardless of what the probation department found, would render the caveat to the PRV score surplusage. See *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003) ("[C]ourts must also give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory.").

### 2. VARIABLE ASSESSMENTS

Scandalito next asserts that PRV 2 and OV 9 were incorrectly scored. We disagree.

-4-

PRV 2 addresses "prior low severity convictions." MCL 777.52. The trial court must score PRV 2 at 30 points if "[t]he offender has 4 or more prior low severity felony convictions." MCL 777.52(1)(a). On appeal, Scandalito contends he is not subject to 30 points under PRV 2, because, under the Michigan Penal Code, attempted felonious assault is categorized as a high court misdemeanor. Specifically, felonious assault is "punishable by imprisonment for not more than 4 years or a fine of not more than $2,000.00, or both," MCL 750.82(1), which means that, under MCL 750.92(3), attempted felonious assault is classified as a misdemeanor. See MCL 750.92(3) ("If the offense so attempted to be committed is punishable by imprisonment in the state prison for a term less than 5 years, or imprisonment in the county jail or by fine, the offender convicted of such attempt shall be guilty of a misdemeanor").

However, "[a]n offense labeled a two-year misdemeanor under the Penal Code falls within the definition of 'felony' under the Code of Criminal Procedure." *People v Smith*, 423 Mich 427, 439; 378 NW2d 384 (1985). "In concluding that they could be treated as felonies, we made it abundantly clear that definitions and labels in one code apply only to that particular code; they are not to be transferred and applied to other codes." *People v Washington*, 501 Mich 342, 357; 916 NW2d 477 (2018).

> In other words, an offense expressly labeled a misdemeanor in one code does not necessarily mean the same offense is a misdemeanor for purposes of interpreting and applying a different code. Rather, whether a misdemeanor offense in one code is a misdemeanor or a felony in another code may depend on the latter code's definitions. Although two-year misdemeanors in the Penal Code might be considered misdemeanors for purposes of the Penal Code, when it comes to interpreting and applying provisions in the Code of Criminal Procedure, we held that those same two-year misdemeanors must be considered felonies because they are punishable by more than one year's imprisonment under the latter code's definition of "felony," regardless of those offenses' "misdemeanor" labels. [*Id.*]

In this case, PRV 2 falls under Michigan's Code of Criminal Procedure, not the Michigan Penal Code, and, therefore, the Michigan Code of Criminal Procedure's definitions are what dictate what qualifies as a low severity felony conviction.

Under Michigan's Code of Criminal Procedure, felonious assault is a class "F" felony. MCL 750.82; MCL 777.16d. Attempts to commit a class "F" felony qualify as class "H" offenses. MCL 777.19. Class "H" crimes qualify as prior low severity felony convictions. MCL 777.52(2)(a). Accordingly, the trial court did not err by assessing PRV 2 at 30 points, because attempted felonious assault, under the Michigan Code of Criminal Procedure, is a low severity felony conviction.

The court also did not err by scoring OV 9 at ten points. OV 9 addresses the number of victims of a crime. MCL 777.39. A ten-point score is warranted if "[t]here were 2 to 9 victims who were placed in danger of physical injury or death . . . ." MCL 777.39(1)(c). OV 9 counts "each person who was placed in danger of physical injury or loss of life or property as a victim." MCL 777.39(2)(a). "[O]ffense variables are generally offense specific. The sentencing offense determines which offense variables are to be scored in the first place, and then the appropriate offense variables are generally to be scored on the basis of the sentencing offense." *People v*

*Sargent*, 481 Mich 346, 348; 750 NW2d 161 (2008). "[W]hen [assessing] OV 9, only people placed in danger of injury or loss of life when the sentencing offense was committed (or, at the most, during the same criminal transaction) should be considered." *Id.* at 350. While "OV 9 does not provide for consideration of conduct after completion of the sentencing offense[,]" *People v McGraw*, 484 Mich 120, 133-134; 771 NW2d 655 (2009), "[a] close proximity to a physically threatening situation may suffice to count the person as a victim," *People v Rodriguez*, 327 Mich App 573, 582; 935 NW2d 51 (2019) (quotation marks and citation omitted).

Scandalito argues his cousin was only placed in danger of immediate harm after Scandalito completed his attempt to rob his grandmother. However, Scandalito's testimony indicates his cousin was in the room with him and his grandmother while he was committing the sentencing offense. Indeed, his cousin tackled Scandalito to the ground during the sentencing offense. Accordingly, Scandalito's testimony supports the finding he was in the middle of committing the sentencing offense when his cousin tackled him. As a result, Scandalito's cousin was placed at immediate risk of being injured during the sentencing offense, so he must be counted as a victim under OV 9.

Nevertheless, Scandalito argues the sentencing offense ended when his cousin offered him his keys, because, once he was offered the keys, his intent to rob his grandmother of her keys was extinguished, meaning the crime was complete. While this information was not part of Scandalito's testimony, it was included in the PSIR. The PSIR indicated that Scandalito's cousin "tried to negotiate with the defendant and told him that he could take his own vehicle so he ran upstairs, got the keys, came back and told [Scandalito] he could take that car and then charged at him trying to get the scissors away from [Scandalito's grandmother's] neck." Thus, the PSIR version of events indicates that Scandalito continued to hold a pair of scissors to his grandmother's neck after being offered his cousin's keys. Under those circumstances, it is not apparent that Scandalito's intent to rob his grandmother ended when his cousin offered him the keys to his vehicle. Consequently, the trial court did not clearly err by finding that both Scandalito's grandmother and his cousin were placed in danger of physical injury or death during the commission of the sentencing offense. The court, therefore, did not err by scoring OV 9 at ten points.

Affirmed.

/s/ Michael J. Kelly
/s/ Christopher M. Murray
/s/ Michael J. Riordan